# CHARLESTON.

## STATE *v.* LAFE ABBOTT.

### (No. 5047.)

Submitted February 3, 1925.    Decided February 10, 1925.

1. INDICTMENT AND INFORMATION—*Indictment for Violation of Prohibition Law in Statutory Form is Good on Demurrer.*

   An indictment for a violation of the prohibition law in the form prescribed in section 37 of chapter 32-A of Barnes' Code, 1923, is good on demurrer.  (p. 160).

   (Intoxicating Liquors, 33 C. J., § 424.)

2. SAME—*Proof of Accused's Interest in Moonshine Still is not Limited to Exact Date Alleged in Indictment But Prior Operation Thereof May Be Shown.*

   Relying for conviction of defendant upon evidence of his interest in a moonshine still, the proof of the State is not limited for that purpose to the exact date alleged in the indictment, but a prior operation of the same still by defendant may be shown, in connection with proof of his interest as alleged.  (p. 161).

   (Intoxicating Liquors, 33 C. J. § 471.)

   (NOTE:  Parenthetical references by Editors, C. J.—Cyc.  Not part of syllabi.)

Error to Circuit Court, Fayette County.

Lafe Abbott was convicted of having an interest in a moonshine still, and he brings error.

*Affirmed.*

*Lon Kelly* and *C. R. Summerfield,* for plaintiff in error.

*E. T. England,* Attorney General, and *R. Dennis Steed,* Assistant Attorney General, for the State.

HATCHER, JUDGE:

Lafe Abbott was found guilty by a jury of having an interest in a moonshine still, at the September term, 1923, of the Circuit Court of Fayette County, and by it was sentenced to the penitentiary for a period of four years and fined $300.00.

Summarized, the evidence of the State is as follows: The Sheriff of Fayette County, with a raiding party, found Vernon Abbott, a son of the defendant, and one Walter Smith,

who was in the employ of the defendant, operating a moon-
shine still at about 3 P. M. on December 21st, 1922, in an old
house locally known as the Rollins house.   During the raid,
the officers were fired upon by two men who ''came up out
of a ravine on a ridge,'' about two hundred fifty yards from
the officers, one of whom was described as having on a red
sweater, and the other as ''a little chunky man.''   John Ab-
bott, a son of the defendant, had on a red sweater when ar-
rested shortly after the raid.   Something like an hour after
the shooting was over, the defendant came in out of the
woods.   The Sheriff testified that while he would not state
positively who the parties were who fired on them, the little
chunky man was about the ''size of Mr. Abbott here'' (indi-
cating defendant).   A boy named Earl Simms testified that
while he was working for the defendant in February of 1922,
he had seen and helped the defendant make whiskey, in a
house called the old Huddleston house, on the very same still
and apparatus which was captured by the officers on this
raid.   Other evidence was offered by the State tending to
prove the interest of defendant in the Rollins operation, and
that he was acting as a lookout for the distillers at the time
of the raid.

The defendant vehemently denied having any knowledge
of, or interest in, the still, and the evidence generally is very
conflicting.   There is sufficient evidence, however, to sustain
the finding of the jury.   The defendant asserts that he was
prejudiced by several rulings of the trial court, as follows:

1.   The indictment in this case charges that the defendant
(and several others) did ''unlawfully and feloniously own,
operate, maintain, possess, and have an interest in,'' etc., a
moonshine still.   The defendant contends that his demurrer
thereto should have been sustained for the reason that the of-
fenses set forth in the indictment are separate and distinct.
In approving an indictment alleging that the defendant did
''sell, give, offer, expose, keep and store for sale and gift,
liquors,'' this Court held in the case of *State* v. *Miller,* 89
W. Va. 85:

> ''Joinder of two or more offenses of the same gen-

eral nature in an indictment is not good ground of demurrer.''

In that case, we held that selling, giving, offering, exposing keeping, and storing for sale, liquors, were offenses of the same general nature. In this case, we must necessarily hold that owning, operating, maintaining, possessing, and having an interest in a moonshine still are likewise offenses of the same general nature. The indictment is in the form prescribed by the statute. The indictment is good.

2. At the close of the State's evidence, the Court overruled a motion of the defendant to require the State to elect on which date it would rely for a conviction in this case, *i. e.*, the time of the raid of the Rollins house or the time the still was operated at the Huddleston house. The Prosecuting Attorney had announced that it was the intention of the State to ask for a conviction upon one ground only, to-wit: that the defendant *had an interest* in a moonshine still on the date mentioned in the indictment, which was ''the ———— day of December, 1922.'' The defendant then moved the Court to strike out all the evidence of witness Simms charging defendant with the operation of a still in the Huddleston house in February, 1922, which motion the Court also overruled. The reasoning of the trial court on these motions, as set forth in the record, was, on the hypothesis that the still found at the Rollins house was the same still operated at the Huddleston house, the jury should not be precluded from considering evidence of the interest of defendant in the still when operated at the Huddleston house, in connection with such other facts and circumstances as tended to show an interest by him in the operation at the Rollins house. We consider the logic of the trial court sound.

Ownership differs from mere operation, maintenance or possession of a still in this respect: operation, maintenance, or possession may be temporary, while ownership is continuous. An operation of a still by defendant having been proven under such conditions as indicated an interest in the ownership thereof, then such interest in the still would be presumed to continue in the defendant until he, in some way, disposed of his interest therein. Interest in a still being a

continuous offense, there can be no doubt but what evidence of the operation at the Huddleston house was clearly admissible.

"Where the offense charged is a continuous one, evidence of other acts than that charged is admissible to explain or to corroborate the evidence showing the act charged."

16 C. J. 592, Para. 1141.

"Upon the trial of an information charging a continuing offense, where there is evidence of acts constituting the offense committed within the period laid in the information, evidence of acts committed prior or subsequent to that period, and before the filing of the information, is admissible when it illustrates, explains, or corroborates evidence of acts shown to have been committed within the period charged."

*Toll* v. *State*, (Florida), 23 So. 942.

But counsel for defendant contend that there is not a scintilla of evidence of any interest of defendant in the Rollins operation. Does the record bear out this claim? The defendant admits being up on a ridge in the vicinity of the Rollins house at the time of the raid; he admits hearing "a lot of shots" down in "Rollins Fork of Falls Branch;" he admits questioning his companion, Will Bickford, as to what all the shooting was about; he admits starting down the ridge in the direction of the creek within a few moments after he heard the shots; he admits hearing two more shots then further up the creek than the others had been; he admits continuing down the ridge to a point where he could see the creek; he admits he then recognized two of his sons, John and Vernon, down on the creek; he admits his companion then told him that he heard Vernon ask Sheriff Conley for a drink of liquor. When defendant realized that his sons were in the vicinity of the Rollins house so shortly after the fusillade there, and that they were in the presence of the Sheriff of his county, had he been ignorant of what was transpiring down there, the natural solicitude of a father would have

impelled him to have gone at once where his sons were, to have learned if they were injured by, or in any way connected with, the shooting. He had already expressed curiosity as to the cause of the shooting. What made him lose his curiosity? His evidence is silent on this matter, but he admits that instead of proceeding further in the direction of his sons and of the shooting, he turned off and went down to his son John's home. According to the evidence of the Sheriff, the defendant did not come into the presence of his sons until about an hour, or an hour and a half, after the raid was over. Then it was that his son, John, cursed him with low vulgarity and bitterness. John's vituperation seemed based on defendant's lack of *nerve* and defendants proneness to *sit around*. The significance of this circumstance is made apparent by the evidence of a witness that subsequent to the raid, defendant pointed out the place where he claimed he was at the time of the raid, saying he did not see how the officers "got in there withcut him seeing them from where he was." Vernon Abbott, who was identified at the still, was a son of defendant and seemingly made his home with defendant. Smith, who was caught operating the still, ate at the table of defendant and slept in the same room with him. He was defendant's hired man and as such, subject to defendant's orders. Is it reasonable to believe that defendant would pay Smith for his time and labor and then have no knowledge of Smith's whereabouts and no interest in the result of Smith's work when that work was being performed during the regular working hours of the day? Is it reasonable to believe that defendant would employ William Bickford to assist in hunting hogs in the mountains, and to clean out his stable, unless his regularly hired man, Walter Smith, was fully occupied at the time in the performance of other work for defendant? Why go to the extra expense of hiring Bickford when Smith, if unoccupied, was available for the same work Bickford did? There is no evidence from the defendant that he had set Smith to perform any labor the afternoon of the raid. The defendant's advice to Smith, after Smith's arrest was: "You will be all right now if you will hold your head and keep your mouth shut." The concern of

the defendant to keep Smith silent, taken in connection with other facts in relation to Smith, impels the inference that defendant was interested in the acts of Smith prior to the arrest.

. 3.  The defendant complains that the officers were permitted to detail the abusive language of John Abbott to the defendant.  From what we have said in regard to assignment of error number 2, it is apparent that we consider this evidence pertinent in connection with other facts and circumstances in the case.  Besides, the defendant, in his examination in chief, voluntarily goes into what John said to him upon the occasion of which he now complains.  Complaint here, of evidence by the State on a matter of which he, himself, testified, comes with scant grace from defendant.

4.  (a)  Mrs. Hattie Abbott, the wife of the defendant, testified in her examination in chief as follows:

> Q.  "This Simms boy has testified, Mrs. Abbott, that Lafe Abbott, your husband, John Abbott and Vernon Abbott, your sons, and one or two of the Bickford boys were engaged in making moonshine liquor down in the old Huddleston house, in which you were raised, for about three weeks during the month of February, 1922.  Did you have any information that anything of that sort was going on up there?"
> A.  I never heard of it."

The proper ground for contradiction having been laid on cross-examination, the Court permitted one of the officers to testify that Mrs. Abbott asked them what was up, and upon being told that the officers had arrested John and Vernon, for being up at a still, she stated: "What?  Have they been up at that old thing again?"  The defendant says this was error.  By the words "that old thing," in her question to the officer, Mrs. Abbott evidently referred to the still.  The word "again" in the question, indicated operation prior to the Rollins operation.  The Huddleston operation was the only operation, prior to the Rollins operation, of which there was evidence.  The manufacture of moonshine whiskey at the Huddleston house, as narrated by Simms, was under such

circumstances that if it had really occurred as he said, the wife of defendant would necessarily have known of it. Consequently her evidence that she never heard of it was a direct contradiction of the evidence of Simms in this respect. In her examination in chief, she virtually says that this prior operation did not happen, yet her question to the officer certainly indicated that a prior operation had occurred. Therefore, was not her question of the officers properly submitted to the jury as tending to impeach her evidence in chief that she never heard of her sons, John and Vernon, operating this still at the Huddleston house?

The trial court at the time instructed the jury that they should consider the testimony of the officer in this respect, "just for impeachment purposes and that alone." The defendant contends that the testimony was improper for impeachment purposes, because it was on a collateral and irrelevant matter. It was necessary, of course, for the State to show an operation of the still. It met this requirement by evidence that the still ("that old thing") had been operated at both the Huddleston and Rollins houses. Simms testified that John and Vernon Abbott were associated with their father, the defendant, in the operation at the Huddleston house. Vernon and defendant's hired man were operating the same still at the Rollins house. The operation, the ownership, the possession and interest in the still at the Huddleston, as well as at the Rollins house, were all so closely interwoven in this respect that her testimony that she did not have any information of the making of moonshine liquor at the Huddleston house by the defendant, and John and Vernon Abbott, cannot be considered merely collateral evidence. Therefore, the State had the right to attack her evidence in this respect.

(b) The Court below erred in permitting the State's witness, Craigo, to testify for the purpose of impeaching Mrs. John Abbott that she had told him there was no use to talk to John and Vernon, that they were hard-headed and you could not tell them anything, etc. Mrs. John Abbott made no statement in her examination in chief that would warrant impeachment on this proposition. While we hold this evi-

dence was improper and immaterial, yet, as it in no way applied to or implicated the defendant, we are equally impressed with the idea that it was not prejudicial to him. In other words, its admission was error, but harmless error.

5. State's instruction number 1 was to the effect that if the jury believed beyond reasonable doubt that the defendant had an interest in a moonshine still on the ———— day of February, 1922, and that his interest continued up to and included the date set out in the indictment, he should be found guilty. This instruction is attacked by the defendant on the ground that there was no evidence to show that the defendant had an interest in the still at the time of the raid, or at any other time, except when the operation was being conducted down at the Huddleston house. The evidence of the witness Simms is that the still found in operation in the Rollins house was the same still which was operated at the Huddleston house. He identified the various parts of the mechanism by certain marks, etc., thereon. When this evidence is taken in connection with the other evidence in the case heretofore referred to herein, we think the instruction was proper.

6. Error is also alleged because the Court refused defendant's instructions numbers 5 and 10. Number 5. would have told the jury that it was necessary for the State to prove "the actual presence of the prisoner at the place where, and at the time when, the crime was committed." It seems hardly necessary to say that one might have an interest in a moonshine still who had never even seen the still, much less have been present at its operation.

Instruction number 10 was the old stereotyped instruction as to the right of the jury to disregard the whole testimony of any witness whom the jury believed from the evidence knowingly testified falsely as to any material fact, etc., the jury being the sole judges of the credibility of the witnesses and the weight of their evidence. In State's instruction number 3, the Court had already sufficiently instructed the jury that they were the sole judges of the evidence, and of the weight thereof, as well as the credibility of the witnesses, together with their right to consider the intelligence of

the witnesses, their conduct, appearance, demeanor, and interest, and to give to the evidence of such witnesses such credit as the jury thought it entitled to. A court is not required to repeat in an instruction for a defendant the law stated and given in an instruction for the State. We therefore see no error in refusing to give the defendant's instruction number 10.

7. The defendant complains that his attorneys were given only forty-five minutes in which to present his case to the jury. We do not find any mention of this matter in the record. The record neither shows how much time was extended to defendant's counsel for argument, nor that counsel made any request of the trial Court for time. Consequently, we cannot consider this assignment of error.

9. The brief of defendant contains no argument on assignment of error number 8, so we infer that this assignment is waived.

Assignment of error number 9 relates to the discovery of certain evidence after the trial which would tend to discredit the testimony of witness Simms. At the trial, the defendant, the members of his family, and several other witnesses attacked the testimony of witness Simms. The after-discovered evidence offered is either cumulative, or collateral to, or corroborative of, the evidence discrediting Simms. As such, it does not furnish proper ground for setting aside the verdict, and granting the defendant a new trial. One of our latest cases in this respect is *State* v. *Edwards,* 95 W. Va. 239, wherein the law, long established, is reiterated as follows:

> "Newly discovered evidence which is merely cumulative and corroborative of evidence already introduced on the trial of a case will not warrant the setting aside of a verdict and awarding a new trial on the motion of the party against whom the adverse verdict and judgment was rendered."

Finding no prejudicial error in the conduct of the trial below, the judgment of the Circuit Court is affirmed.

*Affirmed.*